IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

IVONNA EDKINS

    Plaintiff,

v.

JONES INTERNATIONAL UNIVERSITY, Ltd.

    Defendant,

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Ivonna Edkins, by and through her attorneys, Diane S. King and Monica C. Guardiola of King & Greisen, LLP, brings this Complaint against Jones International University, Ltd, a Colorado corporation doing business in the State of Colorado, and in support thereof states as follows:

### I. INTRODUCTION

1. This suit is brought by former Jones International University, Ltd. Vice-Chancellor Ivonna Edkins under 42 U.S.C. §1981 ("§1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), arising from sex and national origin discrimination by Jones International University, Ltd.

2. The particular employment practices include discrimination against Plaintiff in the terms and conditions of her employment, and a pervasive hostile work environment culminating in the termination of Plaintiff.

**3.** Defendant unlawfully discriminated against Ms. Edkins, created a hostile work environment for her, and ultimately discharged her, all on the basis of her sex (female) and national origin (Polish).

**4.** Defendant targeted Plaintiff for harassment and discriminatory action, and in so doing unlawfully interfered with Plaintiff's employment contract with JIU.

5. Plaintiff seeks all relief available at law and equity including but not limited to damages, attorney fees, costs and interest, and punitive damages, as well as declaratory and injunctive relief.

## II. JURISDICTION AND VENUE

6. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343. This action is authorized and instituted pursuant to 42 U.S.C. § 2000e-5 and § 1981.

7. Venue is proper with this Court pursuant to 28 U.S.C. §1391(b), as all employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

8. All procedural requirements for the filing of this suit have been met. Plaintiff timely filed a Charge of Discrimination alleging sex and national origin discrimination against JIU with the Equal Employment Opportunity Commission ("EEOC). After a thorough investigation by the EEOC, Plaintiff received a Right to Sue letter with a Probable Cause Determination from the Commission and has filed her Complaint within 90 days of receiving said Notice. Exhibit 1, attached.

## III. THE PARTIES

9. Plaintiff Ivonna Edkins is a female and a citizen of the United States who resides in Colorado and California, and, during times relevant to this action, resided and worked in Colorado.

10. At all relevant times, Plaintiff Edkins was an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e(f)

11. Defendant Jones International University, Ltd. is a Colorado corporation with a principal office address of 9697 E. Mineral Avenue, Centennial, CO 80112. Defendant Jones International University Ltd. is an online educational institution.

## IV. GENERAL ALLEGATIONS

12. Ms. Edkins was born and educated in Poland. She received a Master's degree from Wyszynski University in 1987. Ms. Edkins immigrated to the United States in 1987 and obtained a second Master's degree from University of Phoenix in 2000.

13. Ms. Edkins began her employment with Jones International University, Ltd. ("JIU") on October 15, 2007 as Vice-President of Admissions and Enrollment when she was recruited by then-JIU President Terry Erdle.

14. Ms. Edkins had strong performance during her tenure at JIU. On June 19, 2008, CFO Barbara Gutierrez gave Ms. Edkins a $15,000 salary increase to reflect that Ms. Edkins took on significant additional responsibility after she was hired.

15. Effective July 1, 2008, Ms. Edkins was promoted to Vice-Chancellor, due to her substantial accomplishments. For example, enrollments went from 50-70 per month to 250-260 per month, clearly based on Ms. Edkins' efforts and expertise. She earned this promotion due to the efforts and progress Ms. Edkins made in hiring, training and overall structure of the admission counselors.

16. In November 2008, JIU CEO and President Glenn Jones set a target goal of 110% growth in student enrollment, with complimentary subgoals, which were very aggressive. Employees discussed amongst themselves that this goal was unattainable.

17. The JIU Board of Directors discussed the goals in their meeting on January 30, 2009. They too felt that these goals were unrealistic, particularly in light of the fact that in 2008, with Ms. Edkins at the helm of Enrollment, arrived at 39% to 40% growth rate over the prior year. The Board commented that Ms. Edkins' efforts were "remarkable," especially with the economy and businesses posting 5% to 15% growth in the country that year.

18. Despite how unrealistic these goals were, during the first quarter of 2009, Ms. Edkins worked very hard, and she made some of the target numbers and came very close to making other of the numbers.

19. For instance, course registrations resulted in 3950 courses, 347 above the target of 3603 (and up 52% from 2008). Ms. Edkins missed new student target by 60 – the target was 1786, she brought in 1726, with growth up 37% from 2008.

4

20. Due to a technology glitch, 60 students were dropped (students submitted applications on the internet but the applications did not go through) in February and Ms. Edkins was unable to get them reinstated. Otherwise, Ms. Edkins would have met all of the goals that upper management believed were unattainable.

21. Even with this technology failure, JIU was able to post a $250,000 gain in revenue over their projected goal for the first quarter.

22. JIU President and CEO Glenn Jones indicated that he was very pleased with Ms. Edkins' performance and she received numerous compliments from the JIU Board of Directors. In fact, at the Board of Directors' meeting in Vail in October of 2008, Glenn Jones toasted Ms. Edkins in front of all the members of the Board of Directors and JIU Deans, complimenting her on her performance and contribution to JIU that was "JIU life changing."

23. Unfortunately, all of Ms. Edkins' accomplishments counted for nothing when she was then required to report to Bruce Cunningham. In early 2009, Cunningham was put in charge of three "Tiger Teams," *ad hoc* teams created to address pressing issues. Around the same time, Cunningham was also promoted to General Counsel. Cunningham officially became Ms. Edkins' supervisor in February of 2009.

24. Once Cunningham became her supervisor, Cunningham repeatedly grilled Ms. Edkins about her Polish upbringing. Ms. Edkins found Cunningham's questioning and remarks to be intrusive and inappropriate, but given that

Cunningham was her boss, she felt uncomfortable not responding to his questioning.

25.  For example, Cunningham was aware that Ms. Edkins was divorced, and asked if her ex-husband was a "Polack" or an American. He remarked that Ms. Edkins' ex-husband got a "deal" marrying a "Nikita." On occasion, instead of calling her by her name, Cunningham referred to Ms. Edkins as "Polska," remarking, "What's going on, Polska?" Cunningham also asked Ms. Edkins if she received her "papers" through her ex-husband, when she became a United States citizen and if she voted. He quizzed her about growing up in an "iron curtain" country and referred to her birthplace as "cold war Eastern Europe."

26.  Cunningham quizzed Ms. Edkins about whether she would be more comfortable raising a family near her family in Poland. He also made a condescending joke about Ms. Edkins growing up in a big family with one bathroom and rising to her position at JIU, stating "Look at you now, Vice Chancellor making the big bucks."

27.  Cunningham also quizzed her about her personal life and relationships with men. He asked her about her fiancé and her ex-husband. Later, when her engagement was broken off, Cunningham took an extreme interest in a male friend that Ms. Edkins brought to a company-related function. Since the friend she brought to a company-related function sold Vodka, Cunningham would frequently ask Ms. Edkins, "How is Vodka man?" At one point, Cunningham told Ms. Edkins that if she married Vodka guy, she would not have to work. Ms. Edkins was upset by Cunningham's sexist remark and his

6

constant prying into her personal life.  She never heard of Cunningham prying into the private lives of his male employees.

28. Cunningham also made a derogatory remark about Ms. Edkins' Master's degree from Wyszynski University, equating it to a Bachelor's degree in the United States, to which Ms. Edkins' corrected Cunningham and indicated that it was equivalent to a Masters' degree in the United States.

29. In addition, Cunningham made derogatory remarks about another foreign-born woman, Director of Admissions Dominick Arteca's wife, who is originally from South America, calling her a "southamericana" and stating that, "she is probably some subservient South American woman with eight (8) children just happy to be in the states."  Ms. Edkins found Cunningham's remarks about Mrs. Arteca to be sexist, patronizing and rude.

30. Cunningham also made inappropriate comments to Director of Academic Support Mary Ellen Russo, who left JIU because she could not tolerate Cunningham's behavior.  In a meeting, Cunningham commented on Ms. Russo's last name and her being married to an Italian.  He questioned her as to whether or not she or her husband would "break his knee caps," insinuating a mafia connection.  On another occasion, Cunningham threw a pen at Ms. Russo during a meeting.

31. From the beginning of his tenure as her boss, Ms. Edkins observed that Cunningham wanted her out of her position, despite her strong results and the fact that she had had almost no interaction with him previously.  For example, as soon as he became her boss, Cunningham  started leaving her out of

meetings involving her staff, including meeting pertaining to the Call Center creation and technology issues, making decisions without input from Ms. Edkins that involved her area of responsibility, and hiring employees that were to be supervised by Ms. Edkins without consulting with her.

32.     As to decisions made by Cunningham in her area of responsibility, Ms. Edkins had to find out about his decisions from various random sources - line staff, managers, administrative staff or other department staff.

33.     Moreover, Cunningham engaged in questioning Ms. Edkins' managerial staff and her line staff about her, without informing Ms. Edkins, undercutting her authority. These individuals would report to Ms. Edkins that Cunningham had been interrogating them, and would describe these meetings as "strange" and "weird."

34.     Cunningham also invited male employees to socialize, both during work hours and on weekends at his home, and discuss business with him informally, while the female employees were completely excluded from this contact. For example, Cunningham invited several of Ms. Edkins' male employees to his home to watch a basketball game, but did not include Ms. Edkins or any of the other women.

35.     Cunningham's "boy's club" continued to be a problem after Ms. Edkins left JIU. For example, Cunningham organized a JIU softball team and excluded all female employees.

36.     Cunningham was instrumental in hiring Dominick Arteca as Director of Admissions reporting to Ms. Edkins.  Despite the fact that the Director of Admissions was to be Ms. Edkins' direct report, it was Cunningham, Deputy Vice Chancellor/Finance Timothy Burke and Glenn Jones who decided on this hire.  Two well-qualified, internal female candidates had interviewed for the position but were, inexplicably, not hired and the hiring committee decided to look outside for a candidate.

37.     Arteca was hired and started March 30, 2009.  Ms. Edkins was responsible for training Arteca.  When Ms. Edkins met with Arteca and outlined the training, Arteca indicated that he did not intend to do the training, that it was a waste of time and that he did not need to complete the training.  Arteca told Ms. Edkins that she should check with Cunningham to see if this training was needed.  It became clear to Ms. Edkins that Cunningham was already instructing Arteca regarding his responsibilities and his training, and that she was again not only excluded from decision-making, but undermined by Cunningham.

38.     Ms. Edkins was justifiably shocked by this behavior from a new employee under her supervision.  She immediately sent an email to Parent and Cunningham.  Cunningham indicated that Arteca was correct and that Ms. Edkins should ask Arteca what he thought he needed from training.  Cunningham also included a threatening remark that "I am very disturbed that you are already creating conflict with Dominick."

**39.**    Cunningham even told Ms. Edkins up front, "You're going to be pissed off of at me, I am sure."

**40.**     Cunningham also remarked to Ms. Edkins numerous times in their one-on-one meetings that "it looks like blood is in the water and the sharks are out." Cunningham never explained what he meant.

**41.**     During their work on the Tiger Team Compliance Committee, despite her excellent performance, Cunningham led the charge in unnecessarily criticizing her work in an unconstructive manner.

42.     Because Cunningham was participating in, instead of addressing, the hostility in the Tiger Team Compliance meetings and related compliance meetings, Ms. Edkins finally complained to Director of Human Resources Marcia Parent about the hostility at the meetings and the inappropriate comments made by Cunningham.

43.     When Ms. Edkins told Parent that she was afraid that she was going to be terminated, Parent assured her that if she were in danger of losing her job, she would know, since JIU has a process in place, referring to JIU's progressive discipline policy. Parent also told Ms. Edkins that she was "doing a great job," that she did not understand the hostility and that she was going to speak to CEO and President Glenn Jones about it.  Parent then began attending the meetings and verified that Ms. Edkins was being unduly criticized, though Parent's presence caused the other team members to exhibit better behavior.

44.     Ms. Edkins was not the only woman upset by Cunningham's treatment. In fact, numerous of the women who worked for Cunningham were upset by his poor treatment of the female employees and his favoritism towards the male employees.

45.     Human Resources received numerous complaints from other female employees about Cunningham and his inappropriate and sexist behavior.

46.     Several weeks before her abrupt termination, described below, Ms. Edkins had lunch with Deputy Vice Chancellor/Finance Burke and discussed her employment status.  They discussed the very aggressive goals that Glenn Jones had set for JIU.

47.     In that meeting, Burke indicated that he was aware of no performance issues or concerns on the part of Ms. Edkins and, in fact, told her that "we cannot afford to lose you."

48.     Two days before her termination, Ms. Edkins again asked Burke if he had heard anything pertaining to her employment.  She explained that Cunningham was excluding her from meetings pertaining to her department and she explained the situation with Arteca being allowed to opt out of training. Burke indicated that he did not know anything about the issues.  At that time, he did not indicate that there were any concerns with her work performance.

49.     Ms. Edkins asked Burke for advice on how to handle Cunningham and "how to weather this storm," as he had been with the company for 26 years and had seen all kinds of changes.  Burke told Ms. Edkins, "Just ask what you can do to help."

50.     Up to that point, Ms. Edkins had been setting weekly meetings with Cunningham because it was the only way in which she could stay informed about changes that Cunningham was making in her department.  The first week of

11

April, Ms. Edkins set a meeting with Cunningham on April 9, 2009. At that time, she had only heard positive feedback about her performance.

51. Despite this, at the April 9, 2009 meeting with Cunningham, Ms. Edkins was informed by Cunningham that, "*the company has lost trust in you.*" Cunningham provided no explanation as to the meaning of this vague statement. In this same meeting, Parent told Ms. Edkins that she was being given a 2% pay increase retroactive to January 1, 2009 for her 2009 performance.

### V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Sex Discrimination and Hostile Work Environment in Violation of Title VII)**

52. Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

53. Plaintiff was subjected to discrimination on the basis of her gender, female, perpetrated by the Defendant.

54. At all times material to this action, all matters regarding terms, conditions, rights and privileges of Plaintiff's employment have been governed and controlled by the Defendant.

55. Defendant knowingly and intentionally engaged in discrimination against Plaintiff because of her sex.

56. The intentional discriminatory employment practices to which Plaintiff was subjected include, but are not limited to the following:

    a. Inappropriate comments about Ms. Edkins' personal life, including but not limited to, her marital status and relationship history;

    b. Criticism and humiliation in meetings;

    c. Exclusion from critical department meetings;

    d. Exclusion from decision-making in hiring;

    e. Exclusion from Tiger Team I;

    f. Exclusion from social events;

    g. Formation of a "boy's club";

    h. Defendant failing and refusing to take action to correct the effects of the discriminatory practices complained of herein; and

    i. Illegal termination.

57. Because of the sex discrimination was committed by Ms. Edkins' supervisor and adversely affected her employment, Defendant is liable under Title VII.

58. As a proximate result of the Defendant's above-stated discriminatory actions, the Plaintiff has suffered damages including but not limited to loss of wages and has suffered extreme emotional distress. Under Title VII, the conduct by Defendant entitles Ms. Edkins to the full panoply of damages, including punitive damages, attorney fees and costs.

### SECOND CLAIM FOR RELIEF

### (National Origin Discrimination and Hostile Work Environment in Violation of Title VII)

59. Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

60. Plaintiff, as a Polish-born employee, was subjected to an unwelcome pattern and practice of discrimination in her terms and conditions of employment perpetrated by the Defendants because of her national origin.

61. In addition, Defendant JIU condoned a xenophobic hostile work environment and repeatedly and knowingly subjected Plaintiff to this environment, including a pervasive pattern of blatant and offensive remarks about Plaintiff's national origin and the national origin of other individuals.

62. This type of treatment was so severe and pervasive that it altered the conditions of Plaintiff's employment and had an adverse impact on Plaintiff's working environment, and ultimately resulted in Defendants' termination of Plaintiff.

63. JIU knew or should have known of the harassment and hostile environment perpetrated by management, and failed to take immediate and appropriate remedial action.

64. JIU's unlawful conduct toward Plaintiff was in violation of Title VII. Moreover, JIU's conduct toward Plaintiff was malicious, willful and in gross disregard of her federally protected rights.

65. As a proximate result of the Defendant's above-stated discriminatory actions, the Plaintiff has suffered damages including but not limited to loss of wages and has suffered extreme emotional distress.  Under Title VII, the conduct by Defendant entitles Ms. Edkins to the full panoply of damages, including punitive damages, attorney fees and costs.

**THIRD CLAIM FOR RELIEF**

**(National Origin Discrimination and Hostile Work Environment in Violation of 42 U.S.C. § 1981)**

66. Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

67. Plaintiff, as a Polish-born employee, was subjected to an unwelcome pattern and practice of discrimination in her terms and conditions of employment perpetrated by the Defendants because of her national origin.

68. In addition, Defendants condoned an offensively xenophobic hostile work environment and repeatedly and knowingly subjected Plaintiff to this environment, including a pervasive pattern of blatant and offensive remarks about Plaintiff's national origin.

69. This type of treatment was so severe and pervasive that it altered the conditions of Plaintiff's employment and had an adverse impact on Plaintiff's working environment, and ultimately resulted in Defendant' termination of Plaintiff.

70. JIU knew or should have known of the harassment and hostile environment perpetrated by Cunningham and failed to take immediate and appropriate remedial action.

71. JIU's unlawful conduct toward Plaintiff was in violation of 42 U.S.C. Section 1981. Moreover, Defendants' conduct toward Plaintiff was malicious, willful and in gross disregard of her federally protected rights.

72.     Plaintiff has suffered and will continue to suffer in the way of economic losses such as lost compensation and benefits, due to the discriminatory conduct set forth above, as well as non-economic injuries, such as emotional harm.

**WHEREFORE**, Plaintiff respectfully moves this court and prays for:

(a) a declaratory judgment declaring that the Defendant has violated the above described statutes by the aforesaid acts against Plaintiff;

(b) all compensation, back pay, equal pay, front pay and benefits that Plaintiff was denied because of the Defendant's acts, in a sum to be determined by the court and jury;

(c) compensatory and liquidated damages, including for future pecuniary losses, physical/medical injury and harm, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, in a sum to be determined by the jury and/or court;

(d) exemplary or punitive damages in a sum to be determined by the jury and/or court;

(e) legal fees, disbursements, expert fees, and costs of this action;

(f) all legal interest on sums awarded; and

(g) such other relief as the court may deem appropriate.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 8th day of July, 2011.

                                                Respectfully submitted,

                                                KING & GREISEN, LLP


                                                By: <u>s/Diane S. King</u>
                                                     Diane S. King
                                                     Monica C. Guardiola
                                                     1670 York Street
                                                     Denver, Colorado 80206
                                                   (303) 298-9878
                                                   (303) 298-9879 (fax)

                                                Attorneys for Plaintiff

Plaintiff's Address:

Ivonna Edkins
10397 Bluffmont Dr.
Lonetree, CO  80124